1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| Starbucks Corporation,<br><br>                    Plaintiff,<br><br>        v.<br><br>Valtrus Innovations Limited and Key Patent Innovations Limited,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT AND DJ COMPLAINT** |

**PLAINTIFF STARBUCKS CORPORATION'S**
**COMPLAINT ASSERTING VIOLATION OF WASHINGTON'S**
**PATENT TROLL PREVENTION ACT AND DECLARATORY JUDGMENT**
<u>**SEEKING DECLARATIONS OF NON-INFRINGEMENT AND INVALIDITY**</u>

Plaintiff Starbucks Corporation ("Starbucks") alleges as follows against Defendants Valtrus Innovations Limited ("Valtrus") and Key Patent Innovations Limited ("KPI").

## I.    NATURE OF THE ACTION

1.    This is an action under Washington's Patent Troll Prevention Act ("PTPA"), RCW 19.350, enforced through the Washington Consumer Protection Act ("CPA"), RCW 19.86, arising from Defendants' bad-faith assertion of patent infringement against Starbucks.

2.    This is also an action seeking a determination that Starbucks does not infringe the eleven claims of the eleven patents listed in Valtrus's Demand Letter (the "Asserted Claims") and that said Claims are invalid under 35 U.S.C. § 101.

## II.    PARTIES

3.    Plaintiff Starbucks Corporation is a Washington corporation with its principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134. Starbucks was founded in 1971 in Seattle's Pike Place Market and has grown from a single storefront into a global brand that continues to anchor its operations in Seattle. Starbucks employs thousands of people at its Seattle Support Center (global headquarters) alone, and thousands more across Washington in retail, roasting, manufacturing, warehousing, and distribution roles.

4.    Defendant Valtrus Innovations Limited is an Irish company with a principal place of business in Dublin, Ireland. Valtrus appears to be an underfunded shell entity whose sole purpose is to collect patent licensing rents for its parent, Key Patent Innovations, Ltd.

5.    As Valtrus's own financial statements explain, "The company [Valtrus] was incorporated on 3rd April 2020. The company together with its parent, Key Patent Innovations Limited ("parent"), are collectively referred to as the "Group." In January 2021, the company acquired legal title to a patent portfolio relating to a range of various technologies for approximately $32 million.[1] The company was set up solely to acquire this patent portfolio and ***does not beneficially hold any assets or liabilities***. The beneficial owner of the intangible assets is the parent [KPI], as set out in an intercompany deed signed by the company and the parent.

---

[1] The paying of $32 million for 1,865 patents values the patents, on average, at $17,158 each.

Accordingly, the intangible assets and related payables have been recorded in the financial statements of the parent."[2]

6. Defendant KPI is an Irish company with a principal place of business in Dublin, Ireland. KPI is Valtrus's parent and directs Valtrus's enforcement and licensing activities. KPI is the true beneficiary of Valtrus's litigation and demand letter campaigns.

7. Upon information and belief, KPI and Valtrus occupy the same shared-office style "principal place of business" in Dublin, Ireland. In addition to sharing an office, KPI and Valtrus share the same five directors: Angela Quinlan, Glen Gibbons, Máiréad Lyons, Paul Riley, and Paul Seaman. According to deposition testimony given by Valtrus/KPI in another Valtrus litigation, "KPI and Valtrus's shared office space serves merely as a superficial business façade. It is only two by three meters (or approximately 6.5 feet by 10 feet) and contains nothing more than a single desk, a single chair, and some shelving space. The purported office lacks other essential equipment including a server, phone, or basic computer hardware. Only one out of 10 KPI employees visits the office up to once per week, and Ms. Quinlan only visits up to once every two weeks." **Exhibit A** (*SAP Am., Inc. v. Valtrus Innovations Ltd. et al.*, 1:24-cv-00756-GBW, Dkt No. 27 (D. Del. Oct. 2, 2024)).

8. Upon information and belief, Defendants are non-practicing entities, or NPEs.

### III.    JURISDICTION AND VENUE

9. This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq. This action also arises under the Patent Troll Prevention Act enacted by the state of Washington at RCW 19.350 prohibiting bad-faith assertion of patent infringement, and RCW 19.86.020, the Washington State Consumer Protection Act.

10. This Court has subject matter jurisdiction over the claims alleged in this action at least under 28 U.S.C. §§ 1331, 1338, 2201, and 2202, because this Court has exclusive jurisdiction over declaratory judgment claims arising under the Patent Laws pursuant to these statutes.

---

[2] Valtrus Innovations Financial Statements 2022, *SAP Am., Inc. v. Valtrus Innovations Ltd. et al.*, 1:24-cv-00756-GBW, Dkt No. 28-1, at p. 77 (D. Del. Oct. 2, 2024) (emphasis added).

11.     This Court has supplemental jurisdiction over Starbucks state claims under 28 U.S.C § 1367, as Starbucks state law claims arise out of the same case or controversy as its claims for which this Court has original jurisdiction.

12.     Further, this Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) over Starbucks state law claims because the parties are citizens of different states/countries and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over Defendants pursuant to RCW 19.86.160, RCW 4.28.180, and RCW 4.28.185, because they have purposely availed themselves of the privilege of conducting business in the State of Washington, including directed the Demand Letter and subsequent licensing efforts into Washington at Starbucks, a Washington-based company, seeking to extract a Washington-focused license. The violations of RCW chapters 19.86 and 19.350 alleged herein arise from, or are connected with, these transactions. Exercise of personal jurisdiction over Defendants comports with traditional notions of fair play and substantial justice, and jurisdiction is not inconsistent with the United States Constitution or the Washington State Constitution.

14.     Sufficient minimum contacts to exercise personal jurisdiction over Defendants exist, because the claims herein arise out of and relate to Defendants' actions directed at this forum.

15.     Valtrus purposefully and intentionally directed an enforcement campaign into Washington. On February 4, 2025, Valtrus (through U.S. counsel) sent a licensing/enforcement demand "VIA COURIER AND EMAIL" to Starbucks Chief Legal Officer at 2401 Utah Avenue South, Seattle, Washington 98134.  **Exhibit B** (Demand Letter).

16.     Valtrus's Demand Letter states Valtrus "believes that Starbucks requires a license," asserts that Starbucks is "making, using, selling, or offering for sale" offerings that practice Valtrus patents, requests a meeting to discuss a licensing resolution, and provides specific contacts for follow-up.

17.     Valtrus repeatedly followed up with Starbucks in Seattle over seven (7) months. After the February 4 demand, Valtrus's litigation counsel emailed Starbucks CLO in Seattle on

February 14, 2025, May 22, 2025, and August 17, 2025, again pressing for engagement on Valtrus's patent allegations and licensing demands.

18.    In addition, representatives of Starbucks and Valtrus had multiple email and telephonic exchanges as part of Valtrus's efforts to force Starbucks to take a license, including on September 17, 2025 (phone call), September 23, 2025 (multiple emails), and September 24, 2025 (phone conversation and PowerPoint "PPT" presentation). On September 24, 2025, Valtrus and Starbucks had a detailed discussion and Valtrus communicated licensing numbers to Starbucks. On September 25, 2025, Valtrus (via an agent of same) sent Starbucks (via an agent of same) a PPT presentation and multiple "claim charts". The PPT presentation indicated an escalation to litigation against Starbucks, including stating that certain patents were being "asserted" against Starbucks and several of the claim charts state in their title in all caps "ACTIVE LITIGATION". Valtrus's materials also contained unreasonably high settlement demands. Given Valtrus's escalating conduct, its threat of ACTIVE LITIGATION, and its outrageous settlement demands, Starbucks filed this suit to ensure its rights under the PTPA.

19.    Valtrus's Demand Letter and subsequent communications were expressly aimed at Washington. The Demand Letter and subsequent emails, phone conversations, and presentation materials were sent specifically to Starbucks CLO in Seattle and to/with Starbucks representatives who identified themselves as such.

20.    Starbucks is a Washington corporation with its Headquarters in Seattle, Washington. The Demand Letter identifies several open-source platforms allegedly used by Starbucks, including: Apache Kafka, Apache HBase, Apache Casandra, Apache Hadoop, RocksDB Universal Compaction, and Kubernetes. Starbucks employs cloud-based hosting services for these open-source platforms. These cloud-based hosting services include Amazon Web Services and Microsoft Azure.

21.    Amazon Web Services, Inc. is a provider of cloud computing platforms headquartered in Seattle, Washington. Microsoft Azure is a cloud computing platform developed and operated by Microsoft Corporation. Microsoft Corporation is headquartered in Redmond, Washington. As of the second quarter of 2025, Amazon Web Services accounts for 30% of all

Complaint

cloud infrastructure services and Microsoft Azure accounts for 20% of all cloud infrastructure services. *See, e.g.*, https://www.srgresearch.com/articles/cloud-market-growth-stays-strong-in-q2-while-amazon-google-and-oracle-nudge-higher. Valtrus knew, or should have known, that the Demand Letter targeted activities involving Amazon Web Services and Microsoft Azure by identifying Apache Kafka, Apache HBase, Apache Casandra, Apache Hadoop, RocksDB Universal Compaction, and Kubernets as allegedly infringing platforms.  Indeed, statements by Valtrus in other complaints filed on the allegedly open-source patents make clear Valtrus understood Washington companies would be affected.[3] Defendants should have reasonably anticipated being hauled into court in Washington for their targeted direction toward Washington companies and the open-source software provided by these well-known Washington companies.

22.     Valtrus's Demand Letter caused injury to Starbucks in Washington and led Starbucks to suffer actual damages directly caused by Valtrus's actions. As described herein, the meritless allegations identified in Valtrus's Demand Letter forced Starbucks to expend time and resources to investigate the claims, engage counsel to evaluate and dispel uncertainty regarding the nature of Valtrus's infringement allegations, and prepare to protect itself. Valtrus's Demand Letter caused injury to Starbucks business and property, including diversion of in-house time and resources and additional outside counsel time and resources to investigate and respond to Defendants' meritless and non-specific assertions. Valtrus's Demand Letter also caused injury to Starbucks because its generic nature prevents Starbucks from assessing  indemnity protection it might have by the providers of the accused functionality.

23.     KPI directs, controls, authorizes, and benefits from Valtrus's enforcement campaign; Valtrus acted as KPI's agent or alter ego. KPI is the ultimate economic beneficiary and directing principal behind the Valtrus licensing/assertion program described above; Valtrus acted and acts on KPI's behalf in targeting Starbucks. KPI therefore purposefully directed the same Washington-aimed conduct through its agent/alter ego.

---

[3] *See, e.g.*, 2-25-cv-00516, Dkt. No. 1.

24.     In addition, this Court has jurisdiction over Defendants pursuant to Starbucks claim under the PTPA and this Court can exercise pendent jurisdiction over the patent-related claims as they share a common nucleus of operative facts.

25.     Alternatively, jurisdiction over Defendants is proper under Federal Rule of Civil Procedure 4(k)(2).

26.     An actual and justiciable controversy exists between Starbucks and Valtrus and KPI as to whether Defendants have violated the Washington Patent Troll Prevention Act and Consumer Protection Act.

27.     An actual and justiciable controversy exists between Starbucks and Defendants regarding whether Starbucks alleged "offerings" infringe the Asserted Claims, and whether said Claims are invalid.

28.     Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b) because, among other reasons, Valtrus is a foreign company and as such may be sued in any judicial district in the United States in which Valtrus is subject to the Court's personal jurisdiction; Valtrus has conducted business in this District; or a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

29.     Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b) because, among other reasons, KPI is a foreign company and as such may be sued in any judicial district in the United States in which KPI is subject to the Court's personal jurisdiction; KPI has conducted business in this District; or a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

30.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)–(c) because a substantial part of the events giving rise to the claims occurred in this District and Defendants purposefully directed their conduct here.

**COUNT I – BAD-FAITH PATENT ASSERTION (RCW 19.350) VIA WASHINGTON CPA (RCW 19.86)**

31.     Starbucks realleges and incorporates by reference the foregoing paragraphs.

32.     On February 4, 2025, Valtrus—through its litigation counsel—sent a Demand Letter to Starbucks Chief Legal Officer at Starbucks Seattle headquarters. Notably, Valtrus's litigation counsel has sued Starbucks multiple times, and Valtrus' use of this particular litigation counsel created a reasonable apprehension of suit. Fabricant has filed five (5) lawsuits on behalf of Valtrus, including in cases asserting the same patents that Valtrus has alleged against Starbucks, further increasing Starbucks apprehension of suit.

33.     The Demand Letter claims Starbucks "requires a license" and attaches "Table 1," which identifies eleven patents and lists, for each, a "Select Claim" and "Starbucks Relevant offerings." For multiple entries, Valtrus describes the accused offerings as "All offerings using Apache Kafka/Kubernetes/Hadoop/Cassandra/RocksDB," and provides links to public project websites instead of any claim-element mapping. **Exhibit B** (Demand Letter).

34.     Valtrus's Demand Letter asserts that "all offerings using" various open-source platforms (e.g., Apache Kafka, HBase, Hadoop, Cassandra, RocksDB, Kubernetes) infringe Valtrus's patents. But each asserted claim in the Demand Letter is a method claim. It is black letter patent law that one does not infringe a method claim by "offering" software.

35.     Valtrus's Demand Letter does not identify the actual "offerings" that allegedly infringe, or even what an "offering" is in the context of Starbucks business.

36.     Valtrus's Demand Letter does not explain how "***all*** offerings" of a particular open-source platform (e.g., Kubernetes) could infringe a patent claim, or how any patent claim could be co-extensive with "all offerings" of an open-source platform.

37.     Valtrus's Demand Letter provides no charts or element-by-element mapping. The Letter fails to identify any specific product or service belonging to Starbucks.

38.     Valtrus's allegations are quintessential bad faith. No reasonable person could believe that any patent method claims cover "all offerings using Apache Kafka," thus making Valtrus's allegations objectively baseless and made in subjective bad faith. It is highly unlikely that litigants as sophisticated as Defendants subjectively, or objectively, hold said beliefs.

39.     Valtrus's Demand Letter claims, falsely, that Valtrus "owns" the Asserted Patents. But ***before*** Valtrus sent its Letter to Starbucks, at least one federal judge already found that KPI,

and not Valtrus, owned most of the rights in the patents that Valtrus has been asserting.[4] Valtrus therefore misrepresented ownership in its Demand Letter, in violation of Washington's Patent Troll Prevention Act.

40.    KPI is the real party that retains exclusionary and economic rights in the patents Valtrus purports to assert, and KPI directs Valtrus's licensing and enforcement. Public filings in other litigation describe Valtrus as a bare trustee that holds title in name only while KPI controls licensing, enforcement, and monetization. *See, e.g.*, **Exhibit C** (*Valtrus Innovations Ltd. v. SAP Am., Inc.*, 2:24-CV-00021-JRG, Dkt No. 54 (E.D. Tex. July 18, 2024); Exhibit D (*Valtrus Innovations Ltd. v. SAP Am., Inc.*, 2:24-CV-00021-JRG, Dkt No. 84-1 (E.D. Tex. Nov. 14, 2024).

41.    According to a pleading in another Valtrus litigation:

a.    Valtrus surrendered any and all exclusionary and substantial rights when it executed the Declaration of Trust ("Declaration") and placed the Asserted Patents in trust for the exclusive benefit of its sole parent company, Key Patent Innovations Limited ("KPI"). Ex. A. The plain, unambiguous language of that Declaration vests KPI with all exclusionary and economic rights to the Asserted Patents. *Id.* Valtrus possesses no rights associated with ownership, as it cannot assign, transfer, license, or enforce the Asserted Patents without KPI's consent. *Id.* at ii, iii. Further, the Asserted Patents do not form any part of Valtrus's estate, meaning they are shielded in the event Valtrus declares bankruptcy. *Id.* at 4. In contrast, KPI's exclusive control over the patents is not limited by Valtrus's consent, and KPI can assign, transfer, license, or enforce the Asserted Patents as it sees fit. *Id.* at ii. In other words, KPI's rights to the Asserted Patents are "unfettered." (Exhibit C at 6).

b.    ***The seriousness of this issue is compounded by the fact that Valtrus is severely undercapitalized and publicly reported that it possesses $1 of total assets. Ex. O at 10. This means that if the Court requires Valtrus to pay court costs, attorneys fees, or the like that exceed merely $1, Valtrus would be unable to do so***, and the Court would have no alternative remedy to require Valtrus to fulfill its obligations.

---

[4] 2:24-CV-00021-JRG, Dkt No. 84-1.

> The Court could not even place a lien or force a sale of the Asserted Patents to pay any court-ordered monetary fees or awards as Valtrus cannot transfer the Asserted Patents or take any action that would place a lien or other encumbrance on the Asserted Patents without KPI's consent. Ex. A at ii. Valtrus is, in effect, nothing more than an uncapitalized shell company created to shield its parent company and actual owner of the Asserted Patents, KPI from judgment.

Exhibit C at 19-20 (emphasis added).

42.     Valtrus's intentional undercapitalization is further evidence of bad-faith assertion. It leverages the high cost of defense knowing that its targets—like Starbucks—face significant risks and expenses should they decide to litigate rather than settle. Whereas Valtrus's only risk is the risk of having to pay attorneys' fees, a risk it has preemptively attempted to avoid by making itself judgment proof. Similarly, because Valtrus is a mere shell used to assert patent infringement against operating companies like Starbucks, Valtrus has no fear of its targets asserting their own counterclaims of infringement.

43.     Until another defendant in a Valtrus litigation exposed KPI as the true owner, Valtrus and KPI engaged in considerable efforts to keep KPI and the true nature of ownership of the Asserted Patents secret. For example, in early pleadings, Valtrus swore it was the owner of "all right and title" to the asserted patents therein, even though that was untrue. The Demand Letter does not disclose KPI.

44.     Much of the Demand Letter appears to be boilerplate.  Indeed, Valtrus has sent the exact same letter to at least one other company, asserting the exact same claims, employing the exact same bad-faith infringement language as described above. The other demand letter was sent to a company whose business bears no resemblance to Starbucks. The sending of carbon copy demand letters to very different companies suggests Valtrus failed to conduct any reasonable pre-demand due diligence.

45.     The materials Vatrus sent to Starbucks on September 25, 2025 constitute additional evidence of bad faith.  By way of non-limiting examples:

   a.     The PPT presentation still secrets KPI.

b. The purported claim charts sent with the materials fail to meet the specificity requirements of the PTPA. In fact, that contain gross omissions and misstatements.

c. The chart for the '416 Patent continues to purport to evidence that Kubernetes "stores license information" without having any actual evidence that said limitation is met.  K8s does not in fact on its own perform this limitation.

d. In the chart for the '332 Patent, Valtrus re-names standard Kubernetes pieces to match the claim (e.g., kubelet as a "client application manager," a Deployment as a "discovery services module," worker nodes as "application servers") without evidence that they perform the specific claimed functions in the claimed sequence. And, the asserted claim requires "notifying a client application manager … with a type of data transfer protocol to use".  Twice Valtrus's chart asserts Kubernetes "notifies Kubelet" with the "associated protocol information" and highlights a kubectl describe deployment output as if it shows such a protocol. But no such showing has been made.

e. Valtrus's claim charts state that multiple open-source "offerings" infringe the '832 Patent but Valtrus's infringement mappings constitute gross mischaracterizations of the accused functionality. For example, calling Cassandra's own write path "interception" can only be done in bad faith. Cassandra does not sit in between the OS and the disk. Cassandra is the application that originates I/O; it isn't a pass-through shim/driver that intercepts host-to-device traffic.

f. The claim charts, which appear from the metadata to have been created the day before, merely purport to demonstrate that Starbucks hires engineers with proficiency in some open-source software and concludes, *ipse dixit*, that Starbucks infringes. Showing screenshots from Stackshare, resumes, and a job ad to suggest Kubernetes use, for example, fails to evidence use of the claimed method by Starbucks (or in Kubernetes, e.g.).

g. All of the asserted claims are method claims but Valtrus fails to specify who or what performs each (or any) limitation.

h.  Not all of the patents in Valtrus letter are charted.

i.  Far from creating the requisite specificity under the PTPA, the materials Valtrus sent to Starbucks on September 25, 2025 further evidence bad faith assertion.

j.  Each claim chart by Valtrus contains material misrepresentations about the capabilities of the accused "offerings". These are not differences of opinion pertaining to infringement; Valtrus has misrepresented the capabilities of the accused functionality and concluded, without evidence or *contra* the evidence, that limitations are met. Actions that constitute bad faith assertion.

46.  Defendants' bad-faith assertions forced Starbucks to expend time and resources to investigate the claims, engage counsel to evaluate and dispel uncertainty regarding the nature of Valtrus's infringement allegations, and prepare to protect itself.

47.  Defendants' conduct constitutes an unfair or deceptive act or practice in trade or commerce that affects the public interest and has caused injury to Starbucks business and property, including diversion of in-house time and resources and additional outside counsel time and resources to investigate and respond to Defendants' meritless and non-specific assertions.

48.  Washington's PTPA makes it unlawful to send a bad-faith assertion of patent infringement to a Washington business. The statute provides a non-exclusive list of factors a court may consider in finding bad faith, including, among others, whether the demand letter (1) lacks factual allegations concerning the specific areas in which the target's products, services, or technology infringe; (2) contains false or misleading statements; or (3) the asserter failed to conduct an adequate pre-demand analysis.

49.  The Demand Letter bears multiple hallmarks of bad faith, including but not limited to: (i) absence of claim charts or element-by-element mapping; (ii) blanket accusations that "all offerings using" staple, general-purpose open-source components infringe; (iii) omission or misstatement of true ownership/exclusionary rights; and (iv) employing broad, boilerplate language suggestive of a lack of pre-demand due diligence.

50.  Indeed, Valtrus's Demand Letter contains allegations of infringement that no reasonable person could believe are true.

51.     Several of the Asserted Claims are expired method claims that require divided infringement. Starbucks had no knowledge of the Patents prior to expiration, making infringement highly unlikely if not impossible. *See* non-infringement pleading, *infra*, incorporated by reference.

52.     Method claims require proof that a single actor performs every step in the United States, or that the steps of other actors are legally attributable to the accused infringer. Valtrus's letter never identifies the actors for each step.

53.     For any indirect theory, Valtrus must still prove direct infringement by someone and knowledge/intent — neither is pleaded in the Letter.

54.     Washington's PTPA (RCW 19.350), via the CPA, treats non-specific, portfolio-style letters that omit claim-element mapping and actor identification as evidence of bad faith.

55.     The Letter's broad reference to "[a]ll offerings using Apache/Kafka/Kubernetes/Hadoop/Cassandra/RocksDB" is not a legal theory. Infringement is claim by claim and element by element; the mere alleged presence of a general-purpose open-source component cannot substitute for proof of each limitation.

56.     Divided infringement dominates: core steps (brokers, replication, control plane scheduling, storage reallocation) are typically performed by cloud providers' managed services, not Starbucks.

57.     And the accused functionalities are staple platforms with substantial non-infringing uses; inducement still requires a specific direct infringer and intent, which the Letter does not identify.

58.     For example, Valtrus alleges that Starbucks infringes Claim 1 of U.S. Patent 8,370,416 merely by "using Kubernetes." Exhibit B.

59.     Kubernetes, also known as K8s, is an open-source system for automating deployment, scaling, and management of containerized applications.

60.     In layperson's terms, Kubernetes comprises software that runs and babysits many copies of an application on many computers so the application stays up, scales to demand, and survives failures.

61.     Claim 1 of the '416 Patent covers license-gated cluster activation. It requires "license information" on a node—including a bundle-type parameter that defines cluster size—and activates the cluster only when the node count complies with that license.

62.     Kubernetes does not work that way. It is an open-source system (Apache 2.0) with no license keys, no bundle-type parameters, and no activation gate tied to node counts.

63.     Even a simple Google search, e.g., "does kubernetes use license keys?" reveals the truth, "no."

64.     The same result occurs with a ChatGPT query, "does kubernetes use license keys?" Again, "no".

65.     Even managed offerings do not infringe the claim. Services like Amazon EKS charge a flat per-cluster hourly fee, not a license that gates activation by node count; they do not impose the claim's bundle-type gating mechanism.

66.     Kubernetes is free and does not use license keys to "turn on" a cluster or cap its size. Saying Starbucks infringes a patent that requires license-gated activation—just because it uses Kubernetes—is not even a close call; it is a basic mismatch anyone should see, making such allegations objectively baseless and made in subjective bad faith.

67.     Indeed, Valtrus's Demand Letter's Table 1 literally asserts that *all offerings using Kubernetes* practice the identified *method* claims of **four different** patents, the '416, '538, '588, and '332 Patents, without identifying any specific Starbucks product/service or mapping claim elements to features. That is not a plausible infringement theory on its face.

68.     Claim 1 of the '416 Patent centers on cluster licensing/compatibility enforcement, including "storing license information… includ[ing] a bundle-type parameter" and activating the cluster only when node count complies with licensing rules. That is a licensing-gated cluster creation flow—not a thing Kubernetes does out-of-the-box.

69.     Claim 1 of the '332 Patent requires hot-deploy in a grid computing environment via a repository server, a discovery services module, notifications to a client application manager on each node, and use of an appropriate hot-deployment plug-in—a very particular workflow that is not how Kubernetes "rolling update" works.

Complaint

70.     Claim 7 of the '538 Patent requires a machine-readable monitoring model that updates when the environment changes and components that autonomously adapt their operation by *reading the model*. Kubernetes usage does not, by itself, implement that model-driven, self-adapting monitoring architecture.

71.     Claim 13 of the '588 Patent requires providing metric definitions in machine-readable form via a metric introspection interface, and a monitoring tool that accesses those definitions and then processes the monitoring data based on them. That is not inherent in "using Kubernetes"; it depends on a particular monitoring stack and interfaces.

72.     And Valtrus's bad-faith allegations are not limited to the patents allegedly covering open-source K8s. For example, U.S. Patent 7,730,218 (Claim 1)—asserted against "all offerings using Hadoop"—requires a *master agent* that constructs and forwards executable code blocks to targets to connect them to NAS. Hadoop/HDFS does not do anything like that; its documented architecture is NameNode/DataNode with clients speaking standard protocols—no "master agent" building and shipping executables. Valtrus's infringement allegation is an architecture-level mismatch.

73.     By way of yet another example, Valtrus accuses "All offerings using Apache HBase" and "All offerings using Apache Cassandra" and "All offerings using RocksDB Universal Compaction" and "All offerings using Apache Kafka Streams using RocksDB Universal Compaction" of infringing Claim 25 of the '832 Patent. These allegations are implausible on their face.

74.     Limitation [a] requires "intercepting communications between a computer system and said storage device." That describes a component that sits in the I/O path—e.g., a block-layer filter/driver, hypervisor filter, storage controller/firmware, or similar shim that passively observes (and possibly transforms) disk/SSD/NVMe/SCSI traffic.

75.     By contrast, a database or stream-processing library is an endpoint that originates file or block I/O through the OS and filesystem. It does not interpose itself *between* the computer and the storage device to "intercept" their communications—there is nothing "in between" because it is one of the endpoints initiating the I/O.

76.     HBase runs at the application layer above HDFS and the OS; it issues I/O but does not interpose on I/O generated by other software to the storage device.

77.     Cassandra is also an application-layer LSM database that originates I/O.

78.     RocksDB is an embedded KV store; it calls the filesystem; it does not sit "between" the OS and the storage device.

79.     Kafka Streams is an application library; optional state stores (often RocksDB) still do not intercept device-level communications.

80.     Valtrus's infringement allegations are objectively baseless and subjectively alleged in bad faith.

81.     And Valtrus's "all offerings" allegations against open-source platforms as opposed to any specific Starbucks implementations is also problematic as it prevents Starbucks from seeking indemnification from the actual providers of any software employed in Starbucks systems, and prevents the actual providers from suing Valtrus based on the Customer-Suit Exception. These are facts that Valtrus may be well aware of. On information and belief, Valtrus and KPI pursue *customers* of target vendors with demand letters and suits to extract licenses—an approach alleged by Red Hat and Vertiv in separate actions.

82.     The materials Valtrus sent on September 25, 2025 are further evidence of Valtrus/KPI's bad faith for the reasons stated, *supra*. Indeed, the materials double-down on Vatrus's bad faith conduct.

83.     The bad faith factors in the PTPA are non-exclusive. Other examples of Valtrus's bad-faith allegations are in the non-infringement sections, *infra*.

84.     The Washington PTPA is enforced through the Washington CPA. Defendants' conduct constitutes an unfair or deceptive act or practice, in trade or commerce, that affects the public interest and has caused injury to Starbucks.

85.     Starbucks is entitled to injunctive relief, actual damages, attorneys' fees, and treble damages to the extent permitted by RCW 19.86.090.

## COUNT II: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 6,889,244

86.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

87.    Valtrus accuses "all offerings using Apache Kafka" of infringing Claim 1 of U.S. Patent No. 6,889,244. Exhibit B at 4.

88.    The '244 Patent expired on January 20, 2022. Starbucks did not have knowledge of said Patent before expiration.

89.    Apache Kafka is an open-source event streaming platform for building real-time data pipelines and streaming applications. It allows applications to publish and subscribe to event streams, storing them durably in topics (logs) which are divided into partitions and distributed across a cluster of brokers.

90.    Claim 1 of the '244 Patent is a method claim. Valtrus's Demand Letter does not explain how Starbucks allegedly performs the claimed method. In a typical Kafka deployment, different actors do different steps: the producer app (limitation [a]), the Kafka brokers (limitation [b], limitation [d]), and the consumer app (limitation [d]). Unless the accused party both runs the brokers and controls the producer and consumer behavior under the *Akamai* precedent's requiring of direction/control, there is no single direct infringer of the method.

91.    Claim 1 covers: A method of transmitting messages between a first node and a second node, wherein the first and second nodes are each coupled to a fault tolerant storage system (FTSS), the method comprising: [a] transmitting a message from the first node to a communication agent in the FTSS; [b] storing the message in a data structure in highly reliable fault-tolerant storage media of the FTSS; [c] processing the message at the FTSS in accordance with a messaging paradigm; and [d] transmitting the message from the FTSS to the second node.

92.    Apache Kafka does not infringe this Claim.

93.    In Kafka, there is no identification of an "FTSS" distinct from generic message brokers. Kafka brokers are not shown to be a fault-tolerant storage system with an internal "communication agent in the FTSS" that meets the claim as construed.

94.     By way of second example, limitation [c] — "processing the message at the FTSS in accordance with a messaging paradigm" — is undefined in the Letter and not inherent to Kafka's append-only log and replication; merely persisting/replicating messages is not "processing" as that term is used in the Claim.

95.     By way of third example, limitation [d] requires the FTSS to transmit the message to the second node. Kafka's standard pull model has consumers fetch data; the FTSS does not affirmatively transmit absent a consumer request.

96.     Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '244 Patent.

## COUNT III: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 7,120,832

97.     Starbucks realleges and incorporates by reference the foregoing paragraphs.

98.     Valtrus accuses "all offerings" of four *different* open-source programs and libraries of infringing a single claim of the '832 patent: "all offerings using Apache HBase"; "all offerings using Apache Cassandra"; "all offerings using RocksDB Universal Compaction"; and "all offerings using Apache Kafka Streams using RocksDB Universal Compaction."[5] Exhibit B at 4.

99.     Apache HBase is an open-source, non-relational (NoSQL) distributed database modeled after Google's Bigtable. It is designed to provide real-time, random read/write access to large datasets within the Apache Hadoop ecosystem. HBase runs on top of the Hadoop Distributed File System (HDFS) or Alluxio, leveraging its distributed storage capabilities.

100.    Apache Cassandra is an open-source, NoSQL distributed database designed for handling large volumes of data with high availability and fault tolerance. It features a partitioned row store architecture with a flexible schema, enabling horizontal scalability across multiple machines.

101.    Although HBase and Cassandra are both popular NoSQL databases, they differ significantly in their architecture, consistency models, and use cases.

---

[5] Here, Valtrus likely means Kafka Streams applications that use RocksDB state stores configured for Universal Compaction.

102.    RocksDB Universal Compaction, also referred to as "tiered compaction" in other LSM-tree implementations, is a compaction strategy designed to prioritize lower write amplification, potentially at the cost of increased read amplification and space usage compared to leveled compaction.

103.    Apache Streams using RocksDB Universal Compaction: Apache Kafka Streams, a library for building streaming applications on Kafka, utilizes RocksDB as its default state store implementation. RocksDB, in turn, employs various compaction strategies to manage its data, and one prominent strategy is Universal Compaction.

104.    Claim 25 covers: A method for monitoring performance of a storage device, comprising: [a] intercepting communications between a computer system and said storage device; [b] analyzing said intercepted communications; and [c] reallocating at least some of said data on said storage device to enhance the performance of said storage device based on said analyzed communications.

105.    None of the accused offerings/libraries infringe method Claim 25.

106.    For example, limitation [a] requires "intercepting communications between a computer system and a storage device". Database libraries (HBase, Cassandra, RocksDB, Kafka Streams) perform application-level reads/writes; they do not "intercept" I/O between a host and a storage "device."

107.    By way of second example, limitation [c] requires, "reallocating at least some of said data on said storage device". RocksDB's compaction and Cassandra/HBase data placement are internal algorithms, not reallocations performed "on the storage device" based on an interception of device I/O.

108.    Starbucks seeks a declaratory judgment that it does not infringe Claim 25 of the '832 Patent.

## COUNT IV: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 7,251,588

109.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

110.    Valtrus accuses "all offerings using Kubernetes" of infringing Claim 13 of the '588 Patent. Exhibit B at 4.

111.    The '588 Patent expired on July 17, 2023. Starbucks did not have knowledge of said Patent before expiration.

112.    *See* description of K8s, *supra*.

113.    Claim 13 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

114.    Claim 13 covers: A method comprising: [a] storing metric definitions for at least one monitored component in a machine-readable format to a data storage device; [b] a monitoring tool accessing the machine-readable metric definitions to determine the metric definitions used in monitoring data collected for the at least one monitored component; [c] the monitoring tool accessing said monitoring data collected for the at least one monitored component; and [d] the monitoring tool processing the monitoring data based at least in part on the corresponding metric definitions.

115.    Kubernetes is an orchestration platform; it does not inherently practice the claimed steps.

116.    Further, limitation [a] requires storing "metric definitions"; the Letter identifies no Starbucks artifacts (e.g., definition files/CRDs) and no storage location.

117.    Limitations [b]-[d] require that the monitoring tool itself "access and process" data based on those definitions. The actors performing these steps are unspecified; if a managed service or third-party tool does this, attribution to Starbucks is lacking under *Akamai*.

118.    There is no showing that Starbucks monitoring (if any) uses machine-readable "definitions" rather than built-in metric discovery, nor that processing is "based on" those definitions as claimed.

119.    Starbucks seeks a declaratory judgment that it does not infringe Claim 13 of the '588 Patent.

## COUNT V: DECLARATORY JUDGMENT OF NON-INFRINGEMENT

## US PATENT NO. 7,376,953

120.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

121.    Valtrus accuses "all offerings using Apache Kafka" of infringing Claim 1 of the '953 Patent. Exhibit B at 4.

122.    The '953 Patent expired on October 25, 2023. Starbucks did not have knowledge of said Patent before expiration.

123.    *See* description of Apache Kafka, *supra*.

124.    Claim 1 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

125.    Claim 1 covers: A method for routing a transaction to a front-end server, comprising: [a] identifying at least one attribute-based category for said transaction; [b] attempting to identify at least one of a plurality of front-end servers to process said transaction based at least in part on said identified attribute-based category and at least in part on said front-end servers being assigned to execute transactions corresponding to said attribute-based category; [c] when at least one of the front-end servers is identified, routing said transaction to one of said at least one identified front-end server; [d] when no front-end server is identified, routing said transaction to a default one of the front-end servers; [e] determining whether the transaction is associated with a new attribute-based category, and if so, assigning the new category to one of the front-end servers; wherein identifying said at least one front-end server comprises comparing said attribute-based category for said transaction to assigned attribute-based categories for said plurality of front-end servers.

126.    Kafka is a distributed log, not a transaction router among "front-end servers". The claim's architecture (category-based server assignment, default server fallback, learning new categories) is absent from standard Kafka usage.

127.    Limitations [a], [b], and [e] require category assignment logic to front-end servers — not present in Kafka; any such logic would be custom application code Valtrus has not identified.

128.    Limitation [d] requires routing to a "default" front-end server if none match —
again, not a Kafka feature.

129.    Kafka topics/partitions are predefined logical channels, not dynamic, per-message
attribute-based categories with default-server fallback as claimed.

130.    Additionally, it seems that no data is sent to a front-end processor of a transaction;
the information is sent to topic partitions which are hosted on Kafka brokers which are back-end
servers.

131.    Starbucks seeks a declaratory judgment that it does not infringe Claim 13 of the
'953 Patent.

## COUNT VI: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 7,640,332

132.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

133.    Valtrus accuses "all offerings using Kubernetes" of infringing Claim 1 of the '332
Patent. Exhibit B at 4.

134.    *See* description of K8s, *supra.*

135.    Claim 1 is a method claim. *See* issues with asserting a method claim against
Starbucks, *supra*.

136.    Claim 1 covers: A method for hot deployment and/or redeployment in grid
computing environment, comprising: [a] adding a new version of an application release bundle in
a repository server; [b] determining by a discovery services module which grid nodes are running
an application associated with the added new version *upon adding* the new version;
[c] notifying a client application manager associated with one or more of the determined grid
nodes about adding the new version along with a type of data transfer protocol to use; and [d] hot
deploying/redeploying the new version on running application servers in a grid node using an
appropriate hot deployment plug-in based on the data transfer protocol by a respective one of the
client application managers.

137.    Kubernetes's rolling updates are triggered by updating deployment manifests, not
"upon adding a new version to a repository server" as required by limitation [b].

138.    The claim requires specific components — "discovery services module," "client application manager," and a "hot deployment plug-in" chosen "based on a notified data transfer protocol". Kubernetes does not include these components or that selection mechanism.

139.    Limitation [c] envisions an explicit "notification" including the protocol to use for transfer; Kubernetes nodes pull images via standard mechanisms without such per-deployment protocol notifications.

140.    Kubernetes deploys applications by employing "rolling updates" on "pods." https://kubernetes.io/docs/tutorials/kubernetes-basics/update/update-intro/. Pods are analogous to the "application server" described by the '332 Patent, and "each Pod is meant to run a single instance of an application." https://kubernetes.io/docs/concepts/workloads/pods/. Updates are implemented "by incrementally replacing the current pods with new ones." https://kubernetes.io/docs/tutorials/kubernetes-basics/update/update-intro/.

141.    Unlike the "hot deploy[ment]" of applications on "running … application servers" as described by the '332 Patent, deployment of the application by Kubernetes requires deployment of an application to a server. *See id*. ("As mentioned in the previous section, when the Pod template for a workload resource is changed, the controller creates new Pods based on the updated template *instead of updating or patching the existing Pods*."). Kubernetes typically achieves updates by creating new pods and terminating old ones, rather than injecting new code into the same running process on the same pod ("hot deploy").

142.    Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '332 Patent.

## COUNT VII: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 7,730,218

143.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

144.    Valtrus accuses "all offerings using Apache Hadoop" of infringing Claim 1 of the '218 Patent. Exhibit B at 4.

145.    Claim 1 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

146.    Apache Hadoop is an open-source software framework that enables the distributed storage and processing of massive datasets across clusters of computers, allowing for scalable and cost-effective big data analytics and processing. It consists of key components like the Hadoop Distributed File System (HDFS) for storage and Hadoop MapReduce for parallel data processing.

147.    Claim 1 covers: A method for connecting a target computer system in a networked computer environment to a target network-attached-storage object, comprising: [a] providing a master-agent executable that continuously executes on a computer system; [b] constructing, by the master agent, an executable code block that, when executed on the target computer system, connects the target computer system to the target network-attached-storage object; and [c] forwarding, by the master agent, the executable code block to the target computer system for execution on the target computer system.

148.    Hadoop/HDFS uses client libraries and name/data node protocols; it does not deploy a "master agent" that builds and forwards executable code blocks to targets to connect them to NAS objects.

149.    Each step requires a very specific remote-execution workflow absent from Hadoop architectures. Valtrus identifies no Starbucks component that continuously runs as a "master agent," constructs per-target executables, and forwards them for execution. If any such agent existed (it does not in standard Hadoop), it would likely be part of third-party software or provider tooling; no attribution to Starbucks is shown.

150.    Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '218 Patent.

## COUNT VIII: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 7,904,686

151.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

152.    Valtrus accuses "all offerings using Apache Hadoop" of infringing Claim 1 of the '686 Patent. Exhibit B at 4.

153.    *See* description of Apache Hadoop, *supra*.

Complaint

154.    Claim 1 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

155.    Claim 1 covers: A method of providing data security for use with a file system, comprising: [a] applying a mapping function to data block numbers associated with a file, where the data block numbers are contained in an index node (inode) associated with the file; and [b] obtaining mapped data block numbers after applying the mapping function, wherein the mapped data block numbers are addresses of data of the file in a storage device.

156.    HDFS metadata maps block IDs to datanodes via NameNode metadata; it does not apply a "mapping function to block numbers contained in an inode" to produce physical storage "addresses".

157.    Limitation [b] requires the output of the mapping to be "addresses in a storage device"; HDFS's mapping yields logical block locations across nodes, not device addresses.

158.    Valtrus identifies no Starbucks file system that performs this inode-level transformation; if performed, it would be done inside the filesystem implementation, not by Starbucks applications.

159.    Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '686 Patent.

**COUNT IX: DECLARATORY JUDGMENT OF NON-INFRINGEMENT**

**US PATENT NO. 7,936,738**

160.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

161.    Valtrus accuses "all offerings using Apache Kafka" of infringing Claim 1 of the '738 Patent. Exhibit B at 4.

162.    *See* description of Apache Kafka, *supra*.

163.    Claim 1 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

164.    Claim 1 covers: A method of storing context information in an outgoing message sent from a node using a protocol stack with layers, comprising: [a] providing the outgoing message from an application to a layer of the protocol stack; [b] selectively indicating to the layer

25

Complaint

that context information is to be obtained for that layer; [c] obtaining context information in accordance with the indication; and [d] adding the obtained context information to the outgoing message such that a response, received from the destination node, to the outgoing message contains the obtained context information.

165.    The claim requires "per-layer" context indication/collection at the protocol stack level. Kafka's user-level headers are not protocol-stack "layer" context as claimed.

166.    Limitation [d] requires that the *response contains the obtained context information*; Kafka does not guarantee that responses echo application-supplied context headers.

167.    The Letter contains no identification of any Starbucks stack that instructs OS/network layers to collect and insert layer-specific context into outgoing messages.

168.    OS/network stack operations would be performed by the host OS or provider infrastructure, not attributable to Starbucks without *Akamai*-level control.

169.    Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '738 Patent.

## COUNT X: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 8,370,416

170.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

171.    Valtrus accuses "all offerings using Kubernetes" of infringing Claim 1 of the '416 Patent. Exhibit B at 5.

172.    Claim 1 covers: A method of creating a clustered computing system, comprising: [a] storing license information for a computing cluster in a memory module associated with a computing node, wherein the licensing information includes a bundle-type parameter that identifies a size of the cluster and at least one additional bundle-type characteristic of the cluster, and one or more node license parameters that identifies a characteristic of a computing node; [b] initializing the computing cluster in a first computing node; [c] adding one or more available computing nodes to the computing cluster; and [d] activating the computing cluster when the computing cluster includes a number of nodes that complies with the bundle-type parameter.

173. The discussion of non-infringement of the '416 Patent, *supra*, is incorporated by reference.

174. In addition, Kubernetes does not perform "storing license information for a computing cluster in a memory module associated with a computing node, wherein the licensing information includes a bundle-type parameter that identifies a size of the cluster and at least one additional bundle-type characteristic of the cluster, and one or more node license parameters that identifies a characteristic of a computing node" and/or "activating the computing cluster when the computing cluster includes a number of nodes that complies with the bundle-type parameter."

175. And nothing in standard kube-adm / control plane enforces activation by node-count license.

176. Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '416 Patent.

## COUNT XI: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 8,379,538

177. Starbucks realleges and incorporates by reference the foregoing paragraphs.

178. Valtrus accuses "all offerings using Kubernetes" of infringing Claim 7 of the '538 Patent. Exhibit B at 5.

179. *See* description of K8s, *supra*.

180. Claim 7 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

181. Claim 7 covers: A method comprising: [a] providing a machine-readable monitoring model that defines configuration of a monitoring environment; [b] responsive to a change occurring in the monitoring environment's configuration, the machine-readable monitoring model updating to reflect the change; and [c] an element of the monitoring environment reading the model and autonomously adapting its operation to the changed configuration.

182. The claim requires a "model" that updates itself to reflect configuration changes and drives autonomous adaptation. Kubernetes does not inherently provide a self-updating monitoring model.

183.    Any such model (e.g., using CRDs and operators) would be part of optional, third-party tooling; Valtrus identifies no Starbucks deployment that matches steps [a]-[c].

184.    K8s does not perform "responsive to a change occurring in said monitoring environment's configuration, said machine-readable monitoring model updating to reflect said change" and/or "an element of said monitoring environment reading said machine-readable model and autonomously adapting its operation to the changed configuration."

185.    Autonomous adaptation by monitoring elements (agents) would be the agents' acts, not Starbucks acts, absent direction/control evidence.

186.    Starbucks seeks a declaratory judgment that it does not infringe Claim 7 of the '538 Patent.

## COUNT XII: DECLARATORY JUDGMENT OF NON-INFRINGEMENT
## US PATENT NO. 8,965,843

187.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

188.    Valtrus accuses "all offerings using Apache Cassandra" of infringing Claim 1 of the '843 Patent. Exhibit B at 5.

189.    Claim 1 is a method claim. *See* issues with asserting a method claim against Starbucks, *supra*.

190.    Apache Cassandra is an open-source, NoSQL distributed database designed for handling large volumes of data with high availability and fault tolerance. It features a partitioned row store architecture with a flexible schema, enabling horizontal scalability across multiple machines. Cassandra uses the Cassandra Query Language (CQL), a SQL-like language for data interaction.

191.    Claim 1 covers: A method of updating data at one or more nodes comprising: [a] determining a node to which a data update is to be transmitted, wherein the node has a node priority; [b] determining a version of data to be provided to the determined node based on a comparison of the version of data at the determined node with another node having a higher node priority; and [c] transmitting the determined version of data to the node.

192.    Cassandra's replication/repair does not hinge on "node priority" comparisons; versioning/consistency derive from timestamps/repairs across replicas, not priority-ordered nodes.

193.    Limitation [b] requires explicitly comparing versions with a "higher-priority" node to choose what to send. That is not how Cassandra works.

194.    Valtrus identifies no Starbucks configuration introducing node-priority semantics into Cassandra replication.

195.    Replication actions occur within database internals possibly on provider-managed nodes; no attribution to Starbucks is shown.

196.    Starbucks seeks a declaratory judgment that it does not infringe Claim 1 of the '843 Patent.

## COUNT XIII: DECLARATORY JUDGMENT OF INVALIDITY
## US PATENT NO. 6,889,244

197.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

198.    Claim 1 of the '244 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

199.    Claim 1 of the '244 Patent covers: A method of transmitting messages between a first node and a second node, wherein the first and second nodes are each coupled to a fault tolerant storage system (FTSS), the method comprising: [a] transmitting a message from the first node to a communication agent in the FTSS; [b] storing the message in a data structure in highly reliable fault-tolerant storage media of the FTSS; [c] processing the message at the FTSS in accordance with a messaging paradigm; and [d] transmitting the message from the FTSS to the second node.

200.    Claim 1 of the '244 Patent is directed to the abstract idea of transmitting, processing, and storing messages.

201.    The '244 Patent did not invent any fault tolerant storage system or any other highly reliable storage media. '244 Patent at 4:28-48 (describing preexisting fault tolerant storage systems).

202.    At Alice step 2, there is no inventive step to save Claim 1.

Complaint

203.    Claim 1 of the '244 Patent does not recite any data structure improvements to any preexisting fault-tolerant storage system. Claim 1 of the '244 Patent is result-focused and functional in nature.

204.    Claim 1 of the '244 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

205.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

## COUNT XIV: DECLARATORY JUDGMENT OF INVALIDITY

## US PATENT NO. 7,120,832

206.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

207.    Claim 25 of the '832 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

208.    Claim 25 of the '832 Patent covers: A method for monitoring performance of a storage device, comprising: [a] intercepting communications between a computer system and said storage device; [b] analyzing said intercepted communications; and [c] reallocating at least some of said data on said storage device to enhance the performance of said storage device based on said analyzed communications.

209.    Claim 25 of the '832 Patent is directed to the abstract idea of altering a storage system based on analyzed information.

210.    At Alice step 2, there is no inventive step to save Claim 25.

211.    Claim 25 of the '832 Patent does not recite any technical improvements to any storage device. Claim 25 of the '832 Patent is result-focused and functional in nature. Claim 25 of the '832 Patent merely recites generic computer functions of collecting, processing, and storing data without reciting any specific technological means for performing those functions.

212.    Claim 25 of the '832 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

213.    Starbucks seeks a declaratory judgment that Asserted Claim 25 is invalid under Section 101.

## COUNT XV: DECLARATORY JUDGMENT OF INVALIDITY

## US PATENT NO. 7,251,588

214.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

215.    Claim 13 of the '588 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

216.    Claim 13 of the '588 Patent covers: A method comprising: [a] storing metric definitions for at least one monitored component in a machine-readable format to a data storage device; [b] a monitoring tool accessing the machine-readable metric definitions to determine the metric definitions used in monitoring data collected for the at least one monitored component; [c] the monitoring tool accessing said monitoring data collected for the at least one monitored component; and [d] the monitoring tool processing the monitoring data based at least in part on the corresponding metric definitions.

217.    Claim 13 of the '588 Patent is directed to the abstract idea of using rules to process collected monitoring data.

218.    At Alice step 2, there is no inventive step to save Claim 13.

219.    Claim 13 of the '588 Patent merely recites generic computer functions of storing, collecting, and processing data without reciting any specific technological means for performing those functions.

220.    Claim 13 of the '588 Patent does not recite any improvements to how computers store or process data.

221.    Claim 13 of the '588 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

222.    Starbucks seeks a declaratory judgment that Asserted Claim 13 is invalid under Section 101.

## COUNT XVI: DECLARATORY JUDGMENT OF INVALIDITY

## US PATENT NO. 7,376,953

223.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

1    224.    Claim 1 of the '953 Patent is invalid as drawn to patent ineligible subject matter

2    pursuant to 35 U.S.C. § 101.

3    225.    Claim 1 of the '953 Patent covers: A method for routing a transaction to a front-end

4    server, comprising: [a] identifying at least one attribute-based category for said transaction;

5    [b] attempting to identify at least one of a plurality of front-end servers to process said transaction

6    based at least in part on said identified attribute-based category and at least in part on said

7    front-end servers being assigned to execute transactions corresponding to said attribute-based

8    category; [c] when at least one of the front-end servers is identified, routing said transaction to one

9    of said at least one identified front-end server; [d] when no front-end server is identified, routing

10    said transaction to a default one of the front-end servers; [e] determining whether the transaction is

11    associated with a new attribute-based category, and if so, assigning the new category to one of the

12    front-end servers; wherein identifying said at least one front-end server comprises comparing said

13    attribute-based category for said transaction to assigned attribute-based categories for said

14    plurality of front-end servers.

15    226.    Claim 1 of the '953 Patent is directed to the abstract idea of classifying a

16    transaction and determining an appropriate processor based on the transaction class.

17    227.    At Alice step 2, there is no inventive step to save Claim 1.

18    228.    Claim 1 of the '953 Patent merely recites generic computer functions of

19    transmitting data, labeling data, and storing data, without reciting any specific technological

20    means for performing those functions.

21    229.    Claim 1 of the '953 Patent does not recite any improvements to transaction

22    execution.

23    230.    Claim 1 of the '953 Patent contains no inventive concept or technical improvement,

24    either in any individual claim step or in the combination of claim steps.

25    231.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under

26    Section 101.

27

28

## COUNT XVII: DECLARATORY JUDGMENT OF INVALIDITY

## US PATENT NO. 7,640,332

232.   Starbucks realleges and incorporates by reference the foregoing paragraphs.

233.   Claim 1 of the '332 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

234.   Claim 1 of the '332 Patent covers: A method for hot deployment and/or redeployment in grid computing environment, wherein the grid computing environment includes one or more grid nodes, comprising: [a] adding a new version of an application release bundle in a repository server; [b] determining by a discovery services module which of the one or more grid nodes are running an application associated with the added new version of the application release bundle upon adding the new version of the application release bundle in the repository server; [c] notifying a client application manager associated with one or more of the determined grid nodes about adding the new version of the application release bundle along with a type of data transfer protocol to use; and [d] hot deploying/redeploying the new version of the application release bundle on running one or more application servers in an associated grid node using an appropriate hot deployment plug-in based on the data transfer protocol by a respective one of the client application managers.

235.   Claim 1 of the '332 Patent is directed to the abstract idea of determining that a deployed workflow has a new version available and releasing the new version.

236.   At Alice step 2, there is no inventive step to save Claim 1.

237.   Claim 1 of the '332 Patent merely recites generic computer functions of obtaining information and transmitting messages and other data, without reciting any specific technological means for performing those functions.

238.   Claim 1 of the '332 Patent does not recite any improvements to applications or server storage thereof.

239.   Claim 1 of the '332 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

240.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

## COUNT XVIII: DECLARATORY JUDGMENT OF INVALIDITY
## US PATENT NO. 7,730,218

241.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

242.    Claim 1 of the '218 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

243.    Claim 1 of the '218 Patent covers: A method for connecting a target computer system in a networked computer environment to a target network-attached-storage object, comprising: [a] providing a master-agent executable that continuously executes on a computer system; [b] constructing, by the master agent, an executable code block that, when executed on the target computer system, connects the target computer system to the target network-attached-storage object; and [c] forwarding, by the master agent, the executable code block to the target computer system for execution on the target computer system.

244.    Claim 1 of the '218 Patent is directed to the abstract idea of connecting two computer systems using executable code.

245.    At Alice step 2, there is no inventive step to save Claim 1.

246.    Claim 1 of the '218 Patent merely recites generic computer functions of executing code, storing code, and establishing connections between two computers, without reciting any specific technological means for performing those functions.

247.    Claim 1 of the '218 Patent does not recite any improvements to storage systems, networked computers, or executable code.

248.    Claim 1 of the '218 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

249.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

Complaint

**COUNT XIV: DECLARATORY JUDGMENT OF INVALIDITY**

**US PATENT NO. 7,904,686**

250.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

251.    Claim 1 of the '686 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

252.    Claim 1 of the '686 Patent covers: A method of providing data security for use with a file system, comprising: [a] applying a mapping function to data block numbers associated with a file, where the data block numbers are contained in an index node (inode) associated with the file; and [b] obtaining mapped data block numbers after applying the mapping function, wherein the mapped data block numbers are addresses of data of the file in a storage device.

253.    Claim 1 of the '686 Patent is directed to the abstract idea of mapping numbers to file addresses in a storage device using a function.

254.    At Alice step 2, there is no inventive step to save Claim 1.

255.    Claim 1 of the '686 Patent merely recites generic computer functions of associating data in an index, performing mathematical equations, and storing information in a storage device, without reciting any specific technological means for performing those functions.

256.    Claim 1 of the '686 Patent does not recite any improvements to data storage.

257.    Claim 1 of the '686 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

258.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

**COUNT XX: DECLARATORY JUDGMENT OF INVALIDITY**

**US PATENT NO. 7,936,738**

259.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

260.    Claim 1 of the '738 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

261.    Claim 1 of the '738 Patent covers: A method of storing context information in an outgoing message sent from a node using a protocol stack with layers, comprising: [a] providing

the outgoing message from an application to a layer of the protocol stack; [b] selectively indicating to the layer that context information is to be obtained for that layer; [c] obtaining context information in accordance with the indication; and [d] adding the obtained context information to the outgoing message such that a response, received from the destination node, to the outgoing message contains the obtained context information.

262.    Claim 1 of the '738 Patent is directed to the abstract idea of affixing received information to an outgoing message and causing a response to be received from the message's recipient.

263.    At Alice step 2, there is no inventive step to save Claim 1.

264.    Claim 1 of the '738 Patent merely recites generic computer functions of transmitting messages, processing and storing data, and obtaining information, without reciting any specific technological means for performing those functions.

265.    Claim 1 of the '738 Patent does not recite any improvements to message transmission or to any protocol stack operation.

266.    Claim 1 of the '738 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

267.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

### COUNT XXI: DECLARATORY JUDGMENT OF INVALIDITY
### US PATENT NO. 8,370,416

268.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

269.    Claim 1 of the '416 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

270.    Claim 1 of the '416 Patent covers: A method of creating a clustered computing system, comprising: [a] storing license information for a computing cluster in a memory module associated with a computing node, wherein the licensing information includes a bundle-type parameter that identifies a size of the cluster and at least one additional bundle-type characteristic of the cluster, and one or more node license parameters that identifies a characteristic of a

computing node; [b] initializing the computing cluster in a first computing node; [c] adding one or more available computing nodes to the computing cluster; and [d] activating the computing cluster when the computing cluster includes a number of nodes that complies with the bundle-type parameter.

271.    Claim 1 of the '416 Patent is directed to the abstract idea of activating a computing cluster based on pre-determined trigger criteria.

272.    At Alice step 2, there is no inventive step to save Claim 1.

273.    Claim 1 of the '416 Patent merely recites generic computer functions of using rules to control system behavior and activating computing clusters without reciting any specific technological means for performing those functions.

274.    Claim 1 of the '416 Patent does not recite any improvements to computing cluster technology or computing nodes.

275.    Claim 1 of the '416 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

276.    Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

**COUNT XXII: DECLARATORY JUDGMENT OF INVALIDITY**

**US PATENT NO. 8,379,538**

277.    Starbucks realleges and incorporates by reference the foregoing paragraphs.

278.    Claim 7 of the '538 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

279.    Claim 7 of the '538 Patent covers: A method comprising: [a] providing a machine-readable monitoring model that defines configuration of a monitoring environment; [b] responsive to a change occurring in the monitoring environment's configuration, the machine-readable monitoring model updating to reflect the change; and [c] an element of the monitoring environment reading the model and autonomously adapting its operation to the changed configuration.

Complaint

280.     Claim 7 of the '538 Patent is directed to the abstract idea of updating a model based on received change information about the model's environment.

281.     At Alice step 2, there is no inventive step to save Claim 7.

282.     Claim 7 of the '538 Patent merely recites generic computer functions of updating a system to reflect a change, without reciting any specific technological means for performing those functions. Claim 7 of the '538 Patent recites abstract, undefined components performing generic computer functions at a high level.

283.     Claim 7 of the '538 Patent does not recite any improvements to any monitoring system or model, instead reciting an automatic update based on a detected change.

284.     Claim 7 of the '538 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

285.     Starbucks seeks a declaratory judgment that Asserted Claim 7 is invalid under Section 101.

## COUNT XXIII: DECLARATORY JUDGMENT OF INVALIDITY
## US PATENT NO. 8,965,843

286.     Starbucks realleges and incorporates by reference the foregoing paragraphs.

287.     Claim 1 of the '843 Patent is invalid as drawn to patent ineligible subject matter pursuant to 35 U.S.C. § 101.

288.     Claim 1 of the '843 Patent covers: A method of updating data at one or more nodes comprising: [a] determining a node to which a data update is to be transmitted, wherein the node has a node priority; [b] determining a version of data to be provided to the determined node based on a comparison of the version of data at the determined node with another node having a higher node priority; and [c] transmitting the determined version of data to the node.

289.     Claim 1 of the '843 Patent is directed to the abstract idea of sharing updated data among multiple data storage locations.

290.     At Alice step 2, there is no inventive step to save Claim 1.

291. Claim 1 of the '843 Patent merely recites generic computer functions of transmitting data, storing data, and comparing data, without reciting any specific technological means for performing those functions.

292. Claim 1 of the '843 Patent does not recite any improvements to data storage technologies or to any data transmission technologies.

293. Claim 1 of the '843 Patent contains no inventive concept or technical improvement, either in any individual claim step or in the combination of claim steps.

294. Starbucks seeks a declaratory judgment that Asserted Claim 1 is invalid under Section 101.

## IV.     PRAYER FOR RELIEF

1. A declaration that Defendants' February 4, 2025 Demand Letter and related conduct constitute a bad-faith assertion of patent infringement under RCW 19.350;

2. A permanent injunction enjoining Defendants, and those acting in concert with them, from making further bad-faith assertions of patent infringement against Starbucks;

3. Actual damages proximately caused by Defendants' conduct, including investigation and response costs, with trebling as permitted under RCW 19.86.090 (subject to the statutory cap);

4. An award of reasonable attorneys' fees and costs under RCW 19.86.090 and Section 285;

5. Findings that the Asserted Claims are invalid and not infringed.

6. Pre- and post-judgment interest as allowed by law; and

7. Any further relief the Court deems just and proper.

## V.     JURY DEMAND

Starbucks demands a trial by jury on all issues so triable.

Complaint

1

Dated: September 25, 2025          Respectfully submitted,

2

By:  */s/ Dario A. Machleidt*

3

Dario A. Machleidt (State Bar No. 41860)
Kathleen R. Geyer (State Bar No. 55493)

4

Christopher P. Damitio (State Bar No. 58633)
**KILPATRICK TOWNSEND & STOCKTON LLP**

5

1420 Fifth Avenue, Suite 3700
Seattle, WA 98101

6

Telephone: (206) 467-9600
dmachleidt@kilpatricktownsend.com

7

kgeyer@kilpatricktownsend.com
cdamitio@kilpatricktownsend.com

8

9

Rachael Lamkin (*PHV forthcoming*)
(State Bar No. 246066)

10

**BAKER BOTTS LLP**
101 California Street

11

Suite 3200
San Francisco, CA 94111

12

Telephone: (415) 291-6200
Facsimile: (415) 291-6300

13

Email: rachael.lamkin@bakerbotts.com

14

*Attorneys for Plaintiff*
*Starbucks Corporation*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint